UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

-against-

JAMES ROBERT VELISSARIS,

Defendant.

22-CV-1347 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Plaintiff Commodity Futures Trading Commission ("CFTC" or the "Commission")

brings this action against pro se Defendant James Robert Velissaris, alleging violations of

Sections 4*o*(1)(A)–(B), 4b(a)(2)(A)–(C), 4b(e)(1)–(3), 6(c)(1) of the Commodity Exchange Act

("the Act"), 7 U.S.C. §§ 6*o*(1)(A)–(B), 6b(a)(2)(A)–(C), 6b(e)(1)–(3), 9(1), and Regulation

180.1(a), 17 C.F.R. § 180.1(a). Pending before the Court is Plaintiff's Motion for Summary

Judgment. For the reasons stated herein, the Court grants Plaintiff's motion.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements and are agreed upon,

unless otherwise noted. ECF No. 47 ("Pl. 56.1"); ECF No. 67 ("Def. 56.1"). The Court also takes

judicial notice of filings on the public dockets of the parallel criminal proceeding. *See United*

*States v. Velissaris*, No. 22-CR-105 (DLC), (S.D.N.Y.) (the "Criminal Action").

### I.    Statement of Facts

Plaintiff CFTC is a federal agency that administers and enforces the Commodity

Exchange Act, 7 U.S.C. §§ 1–27f, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–

190 (2024). Pl. 56.1 ¶ 1.

Infinity Q Capital Management, LLC ("Infinity Q") is a Delaware limited liability company located in New York, New York. *Id.* ¶ 3. Infinity Q was registered with the CFTC as a commodity pool operator ("CPO") between September 23, 2014, and August 11, 2022. *Id.* Relevant here, Infinity Q operated two commodity pools that were registered with the CFTC: the Infinity Q Diversified Alpha Fund ("DAF") and the Infinity Q Volatility Alpha Fund, L.P. ("VAF," together with DAF, the "Funds"). *Id.* ¶ 4. Each fund paid Infinity Q performance and management fees based on its net asset values. *Id.* ¶ 6.

From January 1, 2018, through at least February 28, 2021 (the "Relevant Period"), Defendant James Robert Velissaris was the founder, majority owner, and Chief Investment Officer ("CIO") of Infinity Q. *Id.* ¶ 2. Velissaris was registered with the CFTC as an Associated Person ("AP") of Infinity Q between September 24, 2014, through August 11, 2022. *Id.*

Throughout the Relevant Period, the Funds invested a portion of their assets in "variance swaps" and "corridor variance swaps." *Id.* ¶ 7. "A variance swap is an over-the-counter ('OTC') financial derivative contract that allows a party to speculate on the magnitude of the change in value over time . . . of an underlying asset, such as a stock, stock index, or commodity." *Id.* ¶ 8. One party to the swap pays an amount based on the actual variance of changes of the underlying asset, while the other party pays a fixed amount, referred to as the strike or the projected volatility. *Id.* The net payoff to each party is usually settled in cash at the contract's expiration and is the difference between the actual variance and the strike amount, multiplied by a predetermined, agreed-upon notional value. *Id.*

"A corridor variance swap . . . accumulates variance only when the value of the underlying asset is within a predetermined range." *Id.* ¶ 9. A corridor variance swap has minimum and maximum thresholds. *Id.* When the daily observed value is either below or above

this range, it is excluded from the volatility tabulation. *Id.* The variance and corridor variance swaps that the Funds invested in during the Relevant Period were predicated upon the volatility of various groups or indices of securities, including the Standard and Poor's 500 index. *Id.* ¶ 10.

The parties disagree about whether Infinity Q engaged in a fraudulent mismarking scheme. According to the CFTC, throughout the Relevant Period, Defendant represented telephonically and through email "to current and prospective Fund participants that Infinity Q used an independent, third-party valuation service, called the Bloomberg Valuation Service (also known as 'BVAL'), to independently value the Funds' OTC derivative positions, without any substantive input from Infinity Q." *Id.* ¶ 11–12. Defendant was responsible for and did value the Fund's OTC derivative positions, including by entering the positions into BVAL for valuation. *Id.* ¶ 13.

The CFTC asserts that, contrary to his representations, Defendant manipulated the BVAL calculations to inflate the values of the Funds' derivative positions. *Id.* ¶ 14; *cf.* Def. 56.1 ¶ 14 ("Manual adjustments were made to correct BVAL's systemic errors, not to inflate values."). These manipulations artificially inflated the Funds' net asset values, which caused corresponding increases in the management and performance fees paid to Infinity Q and Defendant. Pl. 56.1 ¶¶ 15, 17. Additionally, the artificial inflation caused the Funds to overpay investors who redeemed their positions during the Relevant Period. *Id.* ¶ 18. According to the CFTC, Defendant purposefully concealed the BVAL alterations to current and prospective investors, because he knew that if disclosed, current Fund participants may have redeemed their investments, while prospective Fund participants may have opted not to invest in the Funds. *Id.* ¶ 16. Following the public reveal of Defendant's misconduct, the Funds engaged "third-party service providers to unwind [the] fraud, including services related to asset reevaluation, asset liquidation, asset

3

distribution, and legal." *Id.* ¶ 19. Overall, the CFTC asserts that the excess fees to Infinity Q, overpayment to Fund participants, and third-party services totaled $125,969,962.78, which consisted of $66,817,537.78 to VAF and $59,152,425.00 to DAF. *Id.* ¶ 20. Defendant personally received $22 million from the scheme. *Id.* ¶ 21.

In February 2022, the U.S. Attorney's Office for the Southern District of New York (the "Government") charged Defendant with six criminal counts sounding in fraud and obstruction, including securities fraud under 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5. *Id.* ¶ 22. On February 25, 2022, Defendant was arraigned before Judge Cote of this District, and he entered an initial plea of not guilty on all counts. *Id.* ¶ 23; *United States v. Velissaris*, No. 22-CR-105 (DLC), ECF No. 13 (S.D.N.Y. Feb. 25, 2022). Defendant was represented by counsel throughout the Criminal Action. Pl. 56.1 ¶ 24.

On November 20, 2022, one week before trial was scheduled to begin, Defendant entered into a plea agreement with the Government in which he agreed to plead guilty to the securities fraud charge, and the Government agreed to dismiss all other open charges. *Id.* ¶ 25. The securities fraud count alleged that, from at least in or about 2018 to at least in or about February 2021, Defendant:

> Willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons; and (c) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to wit, VELISSARIS made fraudulent misrepresentations to others, including investors in the Investment Funds, concerning the process by which the Investment Funds OTC derivative positions were marked at fair value, and VELISSARIS mismarked the

value of OTC derivative positions held by the Investment funds in order to fraudulently inflate their value.

*Id.* ¶ 26.

On November 21, 2022, the court held a change-of-plea proceeding in Defendant's Criminal Action. *Id.* ¶ 29. Defendant pled guilty to one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. *See* ECF Nos. 48-14 at 1, 48-19 at 2. Defendant stated in his plea allocution:

> Between 2018 and February 2021 . . . I made false statements of material fact to investors in the Infinity Q funds that I managed, and I did so knowingly, willfully, and with the intent to defraud. Specifically, I told investors that I was using an independent Bloomberg system to value the fund's over-the-counter derivatives. However, I was making manual adjustments in the system which increased the values of over-the-counter derivative positions that were reported. I knew that if I disclosed what I was doing, investors might have decided to redeem their investments or maybe would not have made the investments in the first place. Some of the communications with investors occurred over the phone and by email in the Southern District of New York. I acknowledge that my actions caused investors to lose money, and for this I am truly sorry.

Pl. 56.1 ¶ 30. Defendant also stated "that the purpose of his manual adjustments was '[t]o increase the value of the securities being held by the fund,' that his scheme affected both DAF and VAF, and that, at the time of his actions, he understood those actions to be wrong and in violation of the law." *Id.* ¶ 31.

The court accepted Defendant's plea to Count One of the indictment, finding that Defendant's plea was made both knowingly and voluntarily. *Id.* ¶ 33. The court also accepted a Consent Preliminary Order of Forfeiture / Money Judgment ("Forfeiture Order"), which both the Government and Defendant signed. *Id.* ¶ 34. In the Forfeiture Order, Defendant admitted the forfeiture allegation of the indictment with respect to the securities fraud count and consented to the entry of a money judgment of $22 million. *Id.*

¶ 35. Pursuant to the plea agreement, the Government dismissed all other charges against Defendant. *Id.* ¶ 36.

Four months later, on March 24, 2024, Defendant filed a motion to withdraw his guilty plea. *Id.* ¶ 37; *United States v. Velissaris*, No. 22-CR-105 (DLC), ECF No. 94 (S.D.N.Y. Mar. 24, 2023). The court denied Defendant's motion, "finding that his guilty plea had been made voluntarily and that 'the evidence to which defendant points does not suggest that he is innocent under either of [the indictment]'s theories of securities fraud.'" Pl. 56.1 ¶ 38; *see also United States v. Velissaris*, No. 22-CR-105 (DLC), 2023 WL 2875487, at *1, *13–14, *18 (S.D.N.Y. Apr. 10, 2023), *aff'd*, No. 23-6379-CR, 2024 WL 4502001 (2d Cir. Oct. 16, 2024).

On April 7, 2023, the court sentenced Defendant to a term of imprisonment of 180 months and ordered him to pay a $100 assessment, a $50,000 criminal fine, and $22 million in forfeiture. Pl. 56.1 ¶ 39. On August 3, 2023, in an Amended Judgment, the court also ordered Defendant to pay restitution to the Funds totaling $125,969,962.78, which consisted of $66,817,537.78 to VAF and $59,152,425.00 to DAF. *Id.* ¶¶ 41, 44. These restitution amounts included the losses incurred by the Funds and attorneys' and third-party service providers' fees. *Id.* ¶ 42.

Subsequently, Defendant appealed the judgment, arguing that the district court "(1) abused its discretion by denying his motion to withdraw his guilty plea and (2) erred in calculating loss to investors at sentencing, resulting in, among other things, an erroneous calculation of the restitution amount." *Id.* ¶ 45. On December 10, 2024, the Second Circuit dismissed Defendant's appeal and affirmed the district court's judgment. *Id.* ¶¶ 46–50; ECF No. 48-24. The Second Circuit found "no merit to [Defendant's] legal

6

innocence theory . . . [and] conclude[d] that the district court acted well within its discretion when it denied [Defendant's] motion to withdraw his guilty plea." ECF No. 48-24 at 6. The Second Circuit also dismissed Defendant's "appeal with respect to the term of imprisonment and affirm[ed] the judgment in all other respects." *Id.* at 9 (cleaned up).

On December 2, 2025, Defendant filed a Motion to Vacate under 28 U.S.C. § 2255, which remains pending in the Criminal Action. *United States v. Velissaris*, No. 22-CR-105 (DLC), ECF No. 149 (S.D.N.Y. Dec. 2, 2025).

Defendant admits the truth of the proceedings in the Criminal Action, but denies the underlying facts and contends that his guilty plea was "involuntary" and "the result of government misconduct and a conflict of interest involving defense counsel." Def. 56.1 ¶¶ 25–36. Specifically, Defendant denies that there was any artificial overvaluation. *Id.* ¶¶ 11–21.

## II.    Procedural Posture

On February 17, 2022, the CFTC initiated this suit against Defendant, bringing various fraud claims under the Act, including fraud and deceit by an AP of a CPO, fraud in connection with swaps, and fraud by deceptive device or contrivance. ECF No. 1 ("Compl.") ¶¶ 141–172. The CFTC requests an order finding that Defendant violated 7 U.S.C. §§ 6b(a)(2)(A)–(C), 6b(e), 6o(1)(A)–(B), 9(1), and 17 C.F.R. § 180.1. *Id.* at 35. The CFTC also requests, *inter alia*, a permanent injunction enjoining Defendant "from committing further violations of the Act as charged[,] . . . trading . . . subject to the rules of any registered entity[,] and acting in any capacity that requires registration with the Commission." *Id.* at 35–37; ECF No. 46 at 1–2. Counsel initially appeared for Defendant, but Defendant has proceeded pro se since October 11, 2024. *See* ECF Nos. 23–24, 36.

The United States appeared as an intervenor in this matter and moved for these proceedings to be stayed until resolution of the Criminal Action. ECF Nos. 10, 12. The stay was lifted on May 1, 2025. ECF No. 53.

On March 27, 2025, the CFTC moved for summary judgment and filed its Rule 56.1 Statement and declaration. ECF Nos. 45–48. On April 25, 2025, Defendant filed his opposition, stylized as a reply brief. ECF No. 52. On May 15, 2025, Defendant filed his declaration and corrected opposition brief. ECF Nos. 54–55. On May 22, 2025, the CFTC filed its reply memorandum of law and an additional declaration. ECF Nos. 56–57. On December 15, 2025, Defendant filed his responsive Rule 56.1 Statement. Def. 56.1.

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 322. If the movant meets his initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citation omitted). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . ." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (cleaned up).

When the movant properly supports his motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*,

554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)). "The function of the district court in considering [a] motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of New York*, 12 F.4th 150, 166–67 (2d Cir. 2021) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (citation omitted).

"When a party moves for summary judgment against a pro se litigant, courts afford the nonmoving party 'special solicitude.'" *CFTC v. Alexandre*, 801 F. Supp. 3d 185, 193 (S.D.N.Y. 2025), *appeal dismissed*, No. 25-2094, 2026 WL 570138 (2d Cir. Jan. 8, 2026) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010)) (cleaned up). District courts must read a pro se litigant's submissions "liberally" and construe them "to raise the strongest arguments that they suggest." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted). Courts "are less demanding of [pro se] litigants generally, particularly where motions for summary judgment are concerned." *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) (citations omitted). This lower standard for pro se litigants does not, however, "relieve [the pro se party] of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen*, 351 F.3d at 50 (citation omitted).

9

**DISCUSSION**

First, the Court determines that collateral estoppel arising from Defendant's guilty plea in the Criminal Action bars Defendant from relitigating the factual issues in this action. Next, the Court determines that Plaintiff is entitled to summary judgment because the elements of criminal securities fraud encompass the elements the CFTC must prove here to establish the various fraud claims brought under the Act. Finally, the Court considers the CFTC's requested remedies, and imposes a permanent injunction and a civil monetary penalty.

## I.    Collateral Estoppel Applies

The Court determines that collateral estoppel applies, such that Defendant cannot dispute the underlying facts that he already admitted to during his guilty plea in the parallel Criminal Action. Collateral estoppel, also known as issue preclusion, prohibits the relitigation of an issue that has already been determined by a valid and final judgment. *Schiro v. Farley*, 510 U.S. 222, 232 (1994) (citing *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)).

In the Criminal Action, Defendant pled guilty to one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff. *See* ECF No. 48-19. Section 78j(b) prohibits the

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Furthermore, Section 78ff penalizes "false or misleading" statements in filings required under the Act. 15 U.S.C. § 78ff(a).

Under the doctrine of collateral estoppel, Defendant's plea precludes him from denying the facts established in the Criminal Action. "It is well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent

10

civil proceeding as to those matters determined by the judgment in the criminal case." *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978). Estoppel generally applies in these circumstances because "[t]he Government bears a higher burden of proof in the criminal than in the civil context and consequently may rely on the collateral estoppel effect of a criminal conviction in a subsequent civil case." *Gelb v. Royal Globe Ins. Co.*, 798 F. 2d 38, 43 (2d Cir. 1986).

> Collateral estoppel bars relitigation when:
>
> (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*Grieve v. Tamerin*, 269 F.3d 149, 153 (2d Cir. 2001) (citation omitted).

Defendant argues that none of these elements apply in this action. *See* ECF No. 55 ("SJ Opp.") at 11–14. The Court disagrees. First, the issues in the present civil action and the parallel Criminal Action are identical. "In order to determine whether the issues are identical for collateral estoppel purposes, courts routinely compare the criminal indictment with the civil complaint." *SEC v. LaGuardia*, 679 F. Supp. 3d 34, 40 (S.D.N.Y. 2023) (citation omitted). Here, the facts set forth in the criminal indictment are substantively identical to those set forth in the present Complaint. *Compare* ECF No. 48-12 ¶¶ 1–42 *with* Compl. ¶¶ 22–61, 109–40. The criminal indictment charged Defendant with securities fraud, arising from a mismarking scheme that involved manipulating BVAL to inflate the value of Infinity Q's Funds' OTC derivative securities. ECF No. 48-12 ¶¶ 1, 19–37. Similarly, the Complaint here alleges that Defendant engaged in a fraudulent scheme to overvalue the Funds' swaps by manipulating the pricing scripts of a third-party pricing service. Compl. ¶¶ 1–9, 51–61; *see also* Pl. 56.1 ¶¶ 11–21 (identifying the third-party pricing service as BVAL).

11

Defendant unsuccessfully attempts to differentiate the facts alleged in this action from those in the Criminal Action. For example, Defendant contends that the actions establish different monetary valuations for the Funds' swaps. SJ Opp. at 12. However, this is not so. *Compare* ECF No. 48-12 ¶ 7 ("[A]fter the mismarking scheme . . . was uncovered . . . [the] positions were sold for hundreds of millions of dollars less than the purported fair values assigned to them by Infinity Q . . . ."); ECF No. 48-24 at 7–8 (affirming that Defendant caused almost $126 million in losses to investors); *with* Compl. ¶ 3 ("Using these fraudulent valuations, [Defendant] successfully caused Infinity Q to show hundreds of millions of dollars in false, exaggerated gains . . . ."). Similarly, Defendant argues incorrectly that the Criminal Action did not establish that Defendant made any misrepresentations to investors. SJ Opp. at 12. However, material misrepresentations were at issue in the Criminal Action, and in fact, Defendant "was charged with and pled guilty to making material misrepresentations" about the asset valuation process within Infinity Q. ECF No. 48-24 at 5. Therefore, the Court concludes that this civil enforcement action shares an identity of issues with the parallel Criminal Action and that the first element of collateral estoppel is met.

Second, the issues in the Criminal Action were actually litigated and actually decided. A "guilty plea incorporate[s] the actual litigation and decision of those underlying issues." *S.E.C. v. Freeman*, 290 F. Supp. 2d 401, 405 (S.D.N.Y. 2003). Additionally, the Second Circuit has long established that "the pendency of a criminal appeal generally does not deprive a judgment of its preclusive effect." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL—CIO*, 905 F.2d 610, 621 (2d Cir. 1990) (internal quotation marks and citation omitted). Here, there is no appeal pending—the Second Circuit has affirmed the judgment against Defendant and the denial of Defendant's Motion to Withdraw the guilty plea.

ECF No. 48-24. Rather, Defendant has moved to vacate, set aside or correct his sentence under 28 U.S. § 2255 in the Criminal Action. *United States v. Velissaris*, No. 22-CR-105 (DLC), ECF No. 149 (S.D.N.Y. Dec. 2, 2025).

Recently, Judge Caproni faced a similar situation in which a defendant argued that "his guilty plea [could not] be invoked for collateral estoppel purposes [in a civil suit brought by the CFTC] because he ha[d] since moved to set aside his criminal sentence pursuant to 28 U.S.C. § 2255." *Alexandre*, 801 F. Supp. 3d at 195. Judge Caproni rejected this argument, reasoning that "[e]ven if the court in the [c]riminal [a]ction were to grant [the defendant's] motion in full, he would simply be re-sentenced; his motion does not seek to vacate his guilty plea or strike from the record the admissions that he offered voluntarily and under oath." *Id.* Similarly, here, the Court determines that the issues were actually litigated and decided, pursuant to Defendant's guilty plea, and Defendant's pending Section 2255 motion does not preclude application of collateral estoppel. Therefore, the second element of collateral estoppel is satisfied here.

Third, Defendant had a full and fair opportunity to litigate in the Criminal Action. "As distinct from the 'actually litigated' element, the requirement that the party opposing collateral estoppel had a full and fair opportunity to litigate the issue requires the court to examine whether the party 'was fully able to raise the same factual or legal issues asserted in the prior proceeding.'" *In re Birnbaum*, 513 B.R. 788, 802 (Bankr. E.D.N.Y. 2014) (quoting *LaFleur v. Whitman*, 300 F.3d 256, 274 (2d Cir. 2002)) (cleaned up). "That [Defendant] entered a guilty plea – rather than being found guilty by way of a verdict – does not diminish his opportunity to litigate the merits of the allegations in the criminal proceeding." *CFTC v. LaMarco*, No. 17-CV-4087 (DG)(JMW), 2024 WL 4905206, at *15 (E.D.N.Y. July 28, 2024). However, the Second Circuit has recognized that "the application of collateral estoppel could result in unfairness if

13

without fault of his own a party against whom collateral estoppel is sought was deprived of crucial evidence or witnesses in the prior action whose outcome is said to bar a subsequent action." *United States v. U.S. Currency in the Amount of $228,536.00*, 895 F.2d 908, 920 (2d Cir. 1990) (internal quotation marks and citation omitted).

Here, it is uncontested that Defendant "was represented by counsel in the criminal proceeding, had the opportunity to contest the charges, and entered his plea knowingly and voluntarily." *Alexandre*, 801 F. Supp. at 195; *see United States v. Velissaris*, No. 22-CR-105 (DLC), 2023 WL 2875487, at *13–14 (S.D.N.Y. Apr. 10, 2023), *aff'd*, No. 23-6379-CR, 2024 WL 4502001 (2d Cir. Oct. 16, 2024) (determining that after conferral with counsel, Defendant voluntarily and rationally entered his guilty plea). In his plea change hearing, Defendant affirmed that after "sufficient opportunity to discuss with" his counsel, he voluntarily changed his plea to guilty. ECF No. 48-15 at 5, 15.

However, Defendant argues that the Government "hid their knowledge of the errors in" BVAL and caused Defendant's counsel to pressure him into consenting to the plea agreement, which constituted *Brady* and Sixth Amendment violations. SJ Opp. at 19–21. Nevertheless, the court in the Criminal Action already determined in its opinion denying Defendant's motion to withdraw his guilty plea that there was no such *Brady* violation. *United States v. Velissaris*, No. 22CR105 (DLC), 2023 WL 2875487, at *20 (S.D.N.Y. Apr. 10, 2023), *aff'd*, No. 23-6379-CR, 2024 WL 4502001 (2d Cir. Oct. 16, 2024). The court specifically considered and rejected the same argument Defendant presents here. *Id.* at *12; SJ Opp. at 20. Additionally, the court determined that Defendant entered into the plea voluntarily and that there was no evidence that Defendant's counsel pressured him into entering into the guilty plea. *Velissaris*, 2023 WL 2875487, at *14. Therefore, despite Defendant's recycled arguments regarding constitutional

14

violations, the Court determines that Defendant did have a full and fair opportunity to litigate the Criminal Action.

Fourth, the issue previously litigated was necessary to support a valid and final judgment on the merits. The facts at issue surrounding Defendant's alleged mismarking scheme to inflate the Funds' OTC swaps through BVAL are clearly central to the securities fraud conviction. "Indeed, the facts incorporated in the Plea Agreement formed the basis for his criminal conviction and sentencing and so were critical and necessary to the criminal judgment." *LaMarco*, 2024 WL 4905206, at \*15. Therefore, the fourth and final element of collateral estoppel is satisfied here.

Accordingly, the Court concludes that Defendant is collaterally estopped from disputing the facts of the securities fraud underlying his criminal conviction.

## II.     Defendant Committed Fraud in Violation of the Act

The Court determines that the CFTC is entitled to judgment as a matter of law as to all of its claims. First, the Court concludes that Defendant violated both Sections 4*o*(1)(A)–(B) and 4b(a)(2)(A)–(C) of the Act. Then, the Court also finds that Defendant violated Section 4b(e)(1)–(3) of the Act. Finally, the Court concludes that summary judgment is also warranted for violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

### a.   Defendant Violated Sections 4*o*(1)(A)–(B) and 4b(a)(2)(A)–(C) of the Act

The Court concludes that the CFTC is entitled to judgment as a matter of law for Counts One and Two, which are violations of Sections 4*o*(1)(A)–(B) and 4b(a)(2)(A)–(C) of the Act. Compl. ¶¶ 141–57.

Section 4*o*(1) of the Act prohibits any CPO or its AP from committing fraud. 7 U.S.C. § 6*o*(1)(A)–(B). Specifically, Section 4*o*(1) states that it is:

15

unlawful for a commodity trading advisor, [AP] of a commodity trading advisor, [CPO], or [AP] of a [CPO], by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or
> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6o(1). The Act defines a CPO, in relevant part, as any person "engaged in a business that is of the nature of a commodity pool . . . who, in connection therewith, solicits, accepts, or receives from others, funds . . . for the purpose of trading in commodity interests . . . ." 7 U.S.C. § 1a(11). Additionally, 17 C.F.R. § 1.3 defines an AP of a CPO as any person who is associated with a CPO "as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged."

> Pursuant to Section 4b(a)(2)(A)–(C) of the Act, it is unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—

> (A) to cheat or defraud or attempt to cheat or defraud the other person;
> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract . . . .

7 U.S.C. § 6b(a)(2).

16

"The elements required to establishing a fraud claim under Section [4]*o*(1) are 'essentially the same' as for a fraud claim under Section [4]b(a)(2)(A)–(C)." *LaMarco*, 2024 WL 4905206, at *18 (quoting *Schwartz v. O'Grady*, No. 86-CV-4243 (JMC), 1990 WL 156274, at *16 (S.D.N.Y. Oct. 12, 1990)). "'The same elements of fraud applicable to violations of Section [4](b)(a)(2)(A)-(C) of the [Act] . . . must be established for this claim, plus an additional element—that the violator acted as a CPO'— or an AP of a CPO." *Id.* (quoting *CFTC v. Wright*, No. 17-CV-4722 (LTS) (DCF), 2018 WL 6437055, at *3 (S.D.N.Y. Dec. 7, 2018)).

To show a violation of Section 4b(a)(2)(A)–(C) of the Act, the CFTC must prove that Defendant: "(1) made misrepresentations or factual omissions; (2) that were material to the investor's decision to invest; and (3) that [he] acted with scienter." *CFTC v. Highland Stone Capital Mgmt., L.L.C.*, No. 11-CV-5209 (KBF), 2013 WL 4647191, at *15 (S.D.N.Y. Aug. 29, 2013) (citing 7 U.S.C. §§ 6b(a)(2)(A)–(C)). "In the Second Circuit, scienter may be satisfied by showing defendants had actual knowledge that the material statements they made were false, or that they were reckless in failing to discover their falsity." *Id.* (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

Here, Defendant violated Sections 4b(a)(2)(A) and (C). As to the first element, Defendant made misrepresentations about the valuation of the Fund's OTC swaps. In his change of plea hearing, Defendant agreed that he was being charged with, and pleading guilty to, making

> fraudulent misrepresentations to others, including investors, in the funds of Infinity Q concerning the process by which the investment fund's over-the-counter derivative positions were marked, falsely representing that they were marked at fair value, and also that [he] mismarked the value of over-the-counter derivative positions held by those investment funds in order to fraudulently inflate their value.

17

ECF No. 48-15 at 8:23–9:7. Additionally, Defendant admitted that the derivatives at issue were variance swaps and corridor variance swaps. Pl. 56.1 ¶¶ 7–10; Def. 56.1 ¶¶ 7–10. Therefore, the first element is satisfied.

Second, these misrepresentations were material. The Second Circuit has affirmed that Defendant's "misrepresentations were material," because "there was 'a substantial likelihood that a reasonable investor would find [those misrepresentations] important in making an investment decision.'" ECF No. 48-24 at 5 (quoting *United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012)) (alteration in original). Therefore, the second element is satisfied.

Third, Defendant satisfies the scienter element because he had actual knowledge that the misrepresentations were false. Defendant stated in his plea allocution that he "made false statements of material fact to investors in the Infinity Q funds that [he] managed, and [he] did so knowingly, willfully, and with the intent to defraud." Pl. 56.1 ¶ 30. Defendant continued that "he knew that if [he] disclosed what [he] was doing, investors might have decided to redeem their investments or maybe would not have made the investments in the first place." *Id.* Therefore, Defendant violated Sections 4b(a)(2)(A) and (C) of the Act.

Furthermore, the additional Section 4o(1) element is also satisfied, because Defendant acted as an AP of a CPO. It is undisputed that Infinity Q was registered with the CFTC as a CPO between September 23, 2014, and August 11, 2022, which encompasses the entirety of the Relevant Period. Pl. 56.1 ¶ 3; Def. 56.1 ¶ 3. Additionally, Defendant was registered with the CFTC as an AP of Infinity Q from September 24, 2014, through August 11, 2022. Pl. 56.1 ¶ 2. Therefore, the Court concludes that the CFTC is entitled to judgment as a matter of law on both Count One, fraud and deceit by an AP of a CPO, and Count Two, fraud in connection with swaps.

### b.  Defendant violated Section 4b(e)(1)–(3) of the Act

The Court concludes that Defendant committed fraud in connection with swaps on a group or index of securities, in violation of Section 4b(e)(1)–(3) of the Act, 7 U.S.C. § 6b(e)(1)–(3). *See* Compl. ¶¶ 158–64. Section 4b(e) makes it unlawful

> for any person . . . in or in connection with any order to make, or the making of . . . any swap, on a group or index of securities . . .
>
> > (1) to employ any device, scheme, or artifice to defraud;
> > (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> > (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

7 U.S.C. § 6b(e).

Considering the similarity of the elements listed in Section 4b(e) to the elements of a Section 4b(a)(2)(A) and (C) violation, the facts establish that Defendant violated Section 4b(e) for the same reasons as discussed above. Defendant employed a scheme to defraud investors in Infinity Q's Funds by making material misrepresentations regarding the valuation of the Funds' OTC swaps. *See supra.* Therefore, summary judgment is also warranted for the CFTC for Count Three.

### c.  Defendant violated Section 6(c)(1) of the Act and Regulation 180.1(a)

The Court determines that summary judgment is warranted for Plaintiff for Count Four, which is fraud by deceptive device or contrivance under Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a). Compl. ¶¶ 165–72. Section 6(c)(1) states, in relevant part: It is "unlawful for any person, directly or indirectly, to use or employ . . . in connection with any swap . . . any manipulative or deceptive device or contrivance," in violation

of CFTC regulations. 7 U.S.C. § 9(1). Rule 180.1(a) was promulgated thereunder and prohibits intentionally or recklessly committing one of the following acts in connection with any swap:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 180.1(a). To prove a violation of Section 6(c)(1) of the Act, and Regulation 180.1(a),

> a plaintiff must show that the defendant engaged in prohibited conduct (including for example, a fraudulent scheme, material misrepresentations, misleading statements or omissions, or the operation of a business that operated as a fraud), with scienter, and in connection with a contract for sale of a commodity in interstate commerce.

*Jing v. Sun*, No. 21-CV-2350 (GRB) (AYS), 2022 WL 1505950, at *17 (E.D.N.Y. Jan. 4, 2022) (citing *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018)). "Courts apply the same standards in determining these elements of Section 6(c) commodities fraud as those applied under the anti-fraud provisions of Section 4b of the Act, codified at 7 U.S.C. § 6b." *Id.* (citing *CFTC v. Southern Trust Metals, Inc.*, 894 F. 3d 1313, 1325 (11th Cir. 2018)). Therefore, for the same reasons as discussed above with regards to Section 4b, it is clear that Defendant has also committed commodities fraud under Section 6(c) and Regulation 180.1(a). Defendant knowingly and purposefully made material misrepresentations in furtherance of a fraudulent scheme to overvalue OTC swaps. *See supra.*

### III.    The Count Grants Injunctive Relief, a Civil Penalty, and Costs and Fees, but Denies Duplicative Equitable Relief

In addition to granting its Motion for Summary Judgment, the CFTC requests that the Court grant injunctive relief and order Defendant to pay civil monetary penalties, disgorgement, restitution, and costs and fees. Compl. at 35–38. The Court grants Plaintiff's requests for

20

injunctive relief, a civil penalty, and costs and fees, although the Court reduces the requested civil penalty. The Court denies Plaintiff's requests for disgorgement and restitution as duplicative.

### a. The Court Grants the CFTC's Request for a Permanent Injunction

First, the Court grants the CFTC's request for permanent injunctive relief, enjoining Defendant from, *inter alia*, trading and engaging in transactions involving commodity interests. Compl. at 35–37. Pursuant to Section 6c of the Act, the CFTC "may seek a permanent injunction prohibiting a defendant from engaging in conduct that violates any provision of the Act or any rule, regulation, or order thereunder." *CFTC v. Safety Cap. Mgmt., Inc.*, No. 15-CV-5551 (NGG) (PK), 2024 WL 4235453, at *11 (E.D.N.Y. Sept. 19, 2024) (citing *CFTC v. Kim*, No. 11-CV-1013 (DLC), 2011 WL 1642772, at *1 (S.D.N.Y. Apr. 15, 2011); 7 U.S.C. § 13a-1). "To obtain this relief, the Commission need only show that a violation of the Act occurred and that there is a reasonable likelihood that the violation will be repeated." *Id.* (citing *CFTC v. Commodity Inv. Grp., Inc.*, No. 5-CV-5741 (HB), 2006 WL 353466, at *1 (S.D.N.Y. Feb. 11, 2006)).

"Issues that a court must consider in determining whether to grant permanent injunctive relief include the egregiousness of the defendant's actions; the isolated, recurrent, or systematic nature of the violations; the degree of scienter involved; the Defendants' recognition of the wrongfulness of the conduct; and the likelihood that the Defendants' customary business activities will present opportunities for future violations." *CFTC v. eFloorTrade, LLC*, No. 16-CV-7544 (PGG), 2020 WL 1673313, at *9 (S.D.N.Y. Apr. 3, 2020), *judgment entered*, 2020 WL 1689827 (S.D.N.Y. Apr. 7, 2020) (cleaned up). "A district court may properly infer the likelihood of future violations from the defendant's past unlawful conduct." *CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1251 (2d Cir. 1986); *see also CFTC v. Int'l Foreign Currency, Inc.*, No. 3-CV-

3577 (DLI) (ARL), 2012 WL 13105801, at *5 (E.D.N.Y. Jan. 30, 2012) (holding that the

defendants' past unlawful conduct of systematic and knowing fraudulent acts over at least a two-

year period indicated "a likelihood of continued violations absent a permanent injunction").

Here, the CFTC requests:

[a]n order of permanent injunction enjoining Velissaris and any other person or entity associated with him, including but not limited to affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert or participation with Velissaris, including any successor thereof, from:

i.   Engaging, directly or indirectly, in conduct in violation of 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6b(e), 6o(1)(A)-(B), 9(1), and 17 C.F.R. § 180.1;
ii.  Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));
iii. Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for his own personal account(s) or for any account in which Defendant Velissaris has a direct or indirect interest;
iv.  Having any commodity interests traded on Velissaris's behalf;
v.   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;
vi.  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;
vii. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or
viii. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38), registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9)) . . . .

Compl. at 35–37.

Considering the severity of Defendant's fraud and violations of the Act, the Court

determines that injunctive relief is warranted. Defendant pled guilty to engaging in a fraudulent

scheme that lasted for approximately three years. *See* ECF No. 48-15 at 8:3–9:7, 15:13–19. Additionally, Defendant committed this securities fraud "willingly[,] willfully[,] and knowingly." *See id.* Overall, Defendant's fraud caused a "nearly $126 million" loss to Infinity Q's investors. ECF No. 48-24 at 8.

Additionally, despite his guilty plea, Defendant continuously takes no responsibility for the fraud. *See* ECF Nos. 55, 67; *eFloorTrade, LLC*, 2020 WL 1673313, at \*10 (granting a request for permanent injunction in part because the defendants "refuse[d] to take responsibility for their actions" and "attempted to back away from [prior] admissions"); *CFTC v. U.S. Metals Depository Co.*, 468 F. Supp. 1149, 1163 (S.D.N.Y. 1979) (imposing permanent injunction in part because defendants "evince no recognition that they have committed any misdeed"). This lack of remorse is demonstrated through Defendant's unsuccessful attempt to withdraw his guilty plea, his pending Section 2255 motion, and his opposition in this action. ECF No. 48-17; *United States v. Velissaris*, No. 22-CR-105 (DLC), ECF No. 149 (S.D.N.Y. Dec. 2, 2025); SJ Opp. In light of all of these factors, there is a likelihood that Defendant will repeat his misconduct.

Specifically, permanently banning Defendant from trading and doing business in commodity interests under the Act is warranted because of Defendant's egregious misconduct, which resulted in $22 million of profit to Defendant. Pl. 56.1 ¶ 35. Courts have instituted permanent injunctions in similar cases. For example, in *CFTC v. Rolando*, a district court issued a permanent injunction enjoining a defendant from violating the Act and engaging "in any activity related to trading in any commodity," when the defendant engaged in a fraudulent investment scheme that artificially inflated the value of investors' holdings and caused a cumulative loss of $7 to $8 million over two years. 589 F. Supp. 2d 159, 165, 171 (D. Conn. 2008). Similarly, in *CFTC v. Kelly*, a court in this District permanently enjoined a trader from

engaging in commodities-related activities, after the defendant was sentenced to 33 months' imprisonment for participating in a fraudulent scheme that generated $4.7 million in profits over two years. 736 F. Supp. 2d 801, 802 (S.D.N.Y. 2010). Here, Defendant engaged in similar fraud on an even larger scale. Therefore, the Court concludes that it is appropriate to permanently enjoin Defendant from engaging in the conduct for which he has been found liable for in the Criminal Action and the present action.

b.    **The Court Imposes a Civil Monetary Penalty on Defendant**

The Court also grants the CFTC's request to order Defendant to pay a civil monetary penalty as prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1). Section 6c of the Act gives district courts the authority "to impose, on a proper showing, on any person found in the action to have committed any violation[,] a civil penalty in the amount of not more than the greater of $100,000 or triple the monetary gain to the person for each violation." 7 U.S.C. § 13a-1(d)(1). "The penalty must be rationally related to the offense and should take into consideration the general seriousness of the violation as well as any particular mitigating or aggravating circumstances that exist." *CFTC v. Park*, No. 16-CV-4120 (VEC), 2018 WL 6324810, at *4 (S.D.N.Y. Dec. 3, 2018) (internal quotation marks and citation omitted). Civil monetary penalties and restitution are appropriate when defendant's violations of "the Act and Commission Regulations were intentional and directly impacted the numerous victims of th[e] fraud." *Kim*, 2011 WL 1642772, at *7 (ordering a treble civil monetary penalty).

However, courts in the Second Circuit "routinely consider" a defendant's "ability to pay" when assessing the amount of a civil monetary penalty. *eFloorTrade*, 2020 WL 1673313, at *13 n.11; *see also CFTC v. Fan Wang*, 261 F. Supp. 3d 383, 388 (S.D.N.Y. 2017) ("[T]he lower fine is more consistent with what the defendant can realistically pay.").

24

Here, the CFTC requests the Court to order Defendant

> to pay civil monetary penalties of not more than the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII, Section 701, see Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act or Regulations, plus post-judgment interest.

Compl. at 37. Specifically, the CFTC requests a civil monetary penalty of $66 million, which is the maximum amount allowed by statute and equals the amount of Defendant's wrongful monetary gain from the securities fraud scheme trebled. ECF No. 46 at 26. The CFTC also requests post-judgment interest. *Id.* at 27.

As discussed, there is no question that Defendant intentionally violated the Act and directly caused millions of dollars of losses to the Funds. *See supra*. Additionally, Defendant did so for his own gain, and wrongfully benefited to the amount of $22 million. *Id.* Furthermore, Defendant's fraud was long term and lasted over a two-year span. *Id.* Therefore, it is clear that a civil monetary penalty is warranted.

However, considering Defendant's incarcerated status, existing criminal forfeiture and restitution obligations, and permanent injunction likely restricting him from working in finance again, it is highly unlikely that Defendant could pay the CFTC's requested $66 million fine. Even without trebling the monetary gain, it is also unlikely that Defendant could pay $22 million, on top of the nearly $150 million he has to pay to satisfy the judgment in the Criminal Action. Additionally, "the deterrence value of a civil penalty is marginal" given the punishments already imposed in the Criminal Action. *Park*, 2018 WL 6324810, at *5.

Balancing Defendant's serious violation and these mitigating factors, the Court imposes a civil monetary penalty of $2,200,000—or ten percent of the disgorgement amount. A higher

penalty amount "would be excessive and unrealistic." *Fan Wang*, 261 F. at 389. Additionally, post-judgment interest will accrue on the civil monetary penalty pursuant to 28 U.S.C. § 1961(a).

### c.   The Court Denies the Equitable Relief of Disgorgement and Restitution

"District courts have found restitution or disgorgement in civil enforcement actions to be unnecessary when there is an existing restitution order with the same or broader scope in a related criminal case." *Park*, 2018 WL 6324810, at *3 (collecting cases). Here, the CFTC requests equitable relief in the same amounts as in the Criminal Action's Forfeiture Order and amendment judgment. The court in the Criminal Action already ordered Defendant to pay $125,969,962.78 in restitution, plus interest. ECF No. 48-23 at 7. Similarly, Defendant has already entered into a Forfeiture Order, which obligates him to forfeit $22 million. ECF No. 48-16. The CFTC requests the Defendant to pay restitution in the amount of $125,969,962.78 and disgorgement in the amount of $22 million, which are identical to the amounts ordered in the Criminal Action. *See* ECF No. 48-23 at 7–8.

The CFTC has not explained why duplicative restitution and disgorgement are necessary. In fact, the CFTC acknowledges that any payments made in satisfaction of Defendant's criminal restitution or forfeiture obligations would be credited, respectively, towards any civil restitution or disgorgement obligations. ECF No. 46 at 24–25. Therefore, the Court sees no reason to impose duplicative equitable relief here and denies the CFTC's request for orders of civil restitution and disgorgement.

### d.   The Court Awards Plaintiff Costs and Fees

Finally, the Court grants Plaintiff's requests for costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2). 28 U.S.C. § 1920 includes as "costs," "[f]ees of the clerk [of any court] and marshal." 28 U.S.C. § 1920(1). Similarly, pursuant to 28 U.S.C. §§ 2412(a)(1)–(2), certain

costs "may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action," and such costs "may include an amount equal to the filing fee prescribed under section 1914(a) of this title." *See CFTC v. Efrosman*, No. 5-CV-8422 (KMW), 2007 WL 2125775, at *8 (S.D.N.Y. Mar. 27, 2007) (ordering the defendants to pay the CFTC's filing fee after entering judgment for the CFTC).

Here, the CFTC fails to brief its costs or include costs in its proposed judgment. *See* ECF No. 49. However, because the CFTC has prevailed in this civil action against Defendant, the Court awards Plaintiff the filing fee of $402.00 prescribed in the Fee Schedule for the United States District Court of the Southern District of New York that was effective on February 17, 2022, which was the date that Plaintiff filed this action. S.D.N.Y., *Court Notice to the Bar: Changes to District Fee Schedule* (Nov. 21, 2023), https://www.nysd.uscourts.gov/sites/default/files/2023-11/Notice%20to%20Bar%20-%20New%20Fee%20Schedule%20120123.pdf; Compl.

27

## CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's requests for equitable relief of disgorgement and restitution and REDUCES the requested civil penalty, but GRANTS Plaintiff's Motion for Summary Judgment in all other respects. Plaintiff CFTC shall submit a proposed form of judgment consistent with this Order by **April 20, 2026.** The Clerk of Court is directed to terminate ECF No. 45.

Dated: March 30, 2026
      White Plains, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge

28